FILED
2011 Mar-29  PM 04:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

CASEY G. COX,

     PLAINTIFF,

VS.                              CASE NO.: CV-10-J-2385-NE

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     DEFENDANT.

### MEMORANDUM OPINION

This matter is before the court on the record and the briefs of the parties.  This Court has jurisdiction pursuant to 42 U.S.C. § 405.  The plaintiff is seeking reversal or remand of a final decision of the Commissioner.  All administrative remedies have been exhausted.

### Procedural Background

The plaintiff applied for Disability Insurance Benefits and Supplemental Security Income due to back and knee pain, a dislike of being around people, a fear "of being killed by people's stupid actions..." as well as nervousness and vision limitations (R. 109).  His alleged onset date of disability was November 1, 2001 (R. 72).  His applications were denied and a hearing was subsequently held in front of an administrative law judge (ALJ) (R. 34-70, 72-84).  The ALJ thereafter rendered an

opinion finding that the plaintiff was not under a disability at any time through the date of his decision (R. 14-23).

The plaintiff's request for administrative review of the ALJ's decision by the Appeals Council was denied on July 2, 2010 (R. 1-3). The ALJ's decision thus became the final order of the Commissioner. *See* 42 U.S.C.§ 405(g). This action for judicial review of the agency action followed (doc. 1). The plaintiff argues that the ALJ "erred egregiously in his instruction to the vocational expert on how to treat a definition of marked in mental work related areas..." and otherwise failed to apply proper legal standards. Plaintiff's memorandum (doc. 9).

The court has considered the record and the briefs of the parties. For the reasons set forth herein, this case is **REVERSED** and **REMANDED.**

## Factual Background

The plaintiff was born July 5, 1972, and completed high school, with two semesters of college (R. 37).[1]  He has lived with his mother since 2002, having quit

---

[1]This was established dispite the ALJ's openly hostile attitude to the plaintiff throughout the hearing. For example, regarding the plaintiff's education, the following exchange took place:

Q. What kind of work were you doing?
A. Building sheds.
Q. Building sheds. Did you go to college for that?
A. No.
Q. Did you graduate college?
A. No, sir.
Q. Do you have four years of college?
A. No.
Q. How many years of college do you have?
A. One – two semesters, I think.

working in 2001 because "I was just feeling so much pain there, and I couldn't keep up with the other guys..." (R. 37). When asked why he has not looked for a job, the plaintiff responded "I just don't like being around people" (R. 38).

The ALJ then accuses the plaintiff of being a drug user or abuser, with the following:

> Q.  How much do you drink at night?
> A.  Maybe two or three beers once a week.
> Q.  When did you get down to that few beers?
> A.   Oh, it's been several years.
> Q.  There's a history that you've had alcohol abuse for a long time.
> A.  It was a long time ago.
> Q.  How long ago is a long time ago?
> A.  About ten years ago.
> Q.  What kind of drugs are you doing?
> A.  None.  Cymbalta that they prescribe to me.
> Q.  What about marijuana and methamphetamine?
> A.  No.

R. 38, 39.

The plaintiff testified he spent his days at home, sitting around the house (R. 39).  The ALJ asked the plaintiff if he was offered a job where he could sit and stand whenever he wanted to in a room by himself, could the plaintiff perform that work? (R. 39).  The plaintiff responded he could not, because "[j]ust having to get out of the car" would keep him from it (R. 39).  The ALJ responded "So you're saying you can't

---

R. 37.

work because you can't get out of a car?" (R. 39). The plaintiff explained he "can't be around people. I get paranoid around them" (R. 40). The plaintiff stated he could not do a job alone because "[y]ou can't get all the way up there without running into anybody" (R. 40).

The ALJ then inquired as to whether the plaintiff had a driver's license, which caused the following dialogue:

Q. Do you drive?
A. No.
Q. Have a driver's license?
A. It's been expired for a long time.
Q. Why did you let it expire?
A. Because I don't drive no more.
Q. You didn't get a DUI did you?
A. No.
Q. Have you ever had a DUI?
A. No.

R. 40.

Continuing with his hostility, the ALJ then inquired as follows:

Q. How were you able to get up here today?
A. My neighbor drove me.
Q. Were there people when you were driving up here?
A. Just him, and my mother was there.
Q. Were there people outside?
A. Outside of here there was, one person.
Q. Are there people in here in this room?
A. Yes.

4

Q. Why aren't you working Mr. Cox?  You're 29 years old?[2]
A. I can't even hardly breathe right now.

R. 40.

Upon questioning from his attorney, the plaintiff explained his phobia of being around other people kept him from working (R. 41).  Medication has helped his depression, but not anxiety, social phobia or paranoia (R. 44, 51).  He also has panic attacks, which he prevents by not leaving home (R. 47).  Although the plaintiff receives mental health treatment, he cannot afford to go to a doctor for his back and knee pain (R. 46).

The plaintiff testified he spends his days playing his guitar and visiting old people in the apartments where he lives (R. 48).  He explained he has trouble sleeping at night because of nightmares where "I defend myself against the creatures all night long" (R. 50).  Inexplicably, the ALJ returns to questioning the plaintiff about his fairly recent arrest for resisting arrest, as follows:

Q. Where were you when you resisted arrest?
A. In the back seat of a friend's car.
Q. In the back seat of a what?
A. A friend's car.
Q. Where had you all been?
A. They rode to the store to get a pack of cigarettes.
Q. You went with them?
A. I just sat in the back.

---

[2]The court notes that the plaintiff was born July 5, 1972, and the hearing was held September 18, 2008, making the plaintiff 36 years old at the time of the hearing.

Q.  You were in the back seat of a car and you were arrested for resisting arrest?

A.  Yes.

...

Q.  How did that come about?

A.  The policeman started acting intimidating, and it made me go weird in my head.

...

Q.  What happened with that charge?

A.  I [inaudible] to the charge, and I'm paying on a fine –

...

Q.  Did you plead guilty, or were you tried?

A.  I didn't plead guilty.  But they wouldn't let me have a lawyer or anything.

Q.  Why are you paying a fine?

A.  Because they just wrote guilty on it and said, here.  It was in Ardmore.  They do that stuff there.

Q.  Did you ever commit domestic violence?

A.  No.

...

Q.  Did [your mother] ever have to call the police on you?

A.  No.

Q.  How much do you say you were drinking now?

A.  I drink two or three during the week.

Q.  Well, in '07, you were drinking pretty heavily.  What was that about?

A.  Where?

ALJ: Let's see.  That was Dr. Johnna Rogers, said you drank until you got drunk, and you have alcoholic [inaudible] episodes.

....

Q.  You abused cannabis and methamphetamine.

A.  I never told him that.

Q.  You didn't tell him that?

A.  No.

Q.  I wonder where he came up with it....

...

Q.  You say you've been arrested five times for assault, domestic violence against his mother–

6

> A.  No.
> Q.  – reckless driving with alcohol.
> A.  No.  That's —
> Q.  Nothing?
> A.  No.
> Q.  So you don't know how he came up with that?
> A.  No.  I've never been arrested for domestic violence or anything like
>      that.

R. 52-54.

The vocational expert ("VE") testified that the plaintiff's past work as a construction worker was heavy and semi-skilled, and that his work as a cabinet maker was medium and skilled (R. 56).  The ALJ then stated to the plaintiff that "Cabinet maker's a pretty good job, Mr. Cox.  Why couldn't you go back and be a cabinet maker?" (R. 56).  In response, the following exchange occurred:

> CLMT:  Breathing the dust, and the people.
> ALJ:     Couldn't do it alone?
> CLMT:  You can't build cabinets alone.
> ALJ:     Pardon?
> CLMT:  You can't do it alone, unless you know how to do everything.
> VE:      Were you a helper?
> CLMT:  Yes.

R. 57.

The ALJ then asked the VE to assume an individual of the plaintiff's age, education, work history and training, with no physical limitations, no unprotected heights or machinery, limited to low stress jobs (which the ALJ then defined as having an SVP-2 or less) with only simple work-related decisions and simple work,

with only occasional interactions with co-workers and work performed in isolation with only occasional supervision (R. 57-58).

The VE testified that such limitations would preclude the plaintiff's past relevant work but allow for jobs which exist in substantial numbers in the economy such as groundkeeper, janitor, and cemetery worker (R. 58). The ALJ then considered the limitations set forth by Dr. James Jeffrey, the plaintiff's psychiatrist (R. 59). The ALJ deemed "mild restrictions of daily activities of living" to be "not important, no limitation" (R. 59). He considered "extreme limitation in social functioning" and defined it for the VE as "a severe impairment of the ability to function in the social area. It would not preclude any social function" (R. 59). The ALJ then addressed the limitation of "moderate difficulties in concentration, persistence, or pace" as meaning "the ability to concentrate for two-hour periods across an eight hour workday" (R. 59); the limitation of "marked impairment regarding work pressures" as requiring an "SVP-2 or less, involving only simple work-related decisions and simple work" (R. 60). The ALJ also included that "[t]hey said he'd have moderate response appropriate to supervision in a work situation, so I'm going to define moderate to supervision as only occasional limitations" (R. 60). After providing these definitions, the ALJ asked the VE whether these limitations would alter her previous opinion, the VE replied that it would not (R. 60).

In response to questions from plaintiff's counsel, the VE testified that marked limitations in responding to work pressures would preclude all employment (R. 62). The ALJ then stated that "marked" was not defined as "seriously affects, but does not preclude" and "that person would still be able to work" (R. 62). The ALJ then asked the VE if work was not precluded, it would not be an impairment, at which time the VE asked the ALJ to start his question again (R. 62). The ALJ noted that the statement of a "marked impairment which seriously affects" but questioned the meaning of the term "seriously affects" (R. 62). Counsel for plaintiff noted that "marked" was defined in the Social Security regulations, but the ALJ responded that it only means "less than severe" (R. 63-64). The ALJ then concludes that because the plaintiff testified that being around people causes him stress, this can be used "as a quantitative basis for defining what marked is or what severe" (sic) (R. 66). The plaintiff' counsel, in an attempt to define "marked" as required by the ALJ, asked the VE whether, assuming marked meant "occasionally" and assuming an individual could respond to customary work pressures only occasionally, would there be any jobs such a person could do (R. 66). The VE answered in the negative, at which point the ALJ decided that "marked" did not mean occasionally, but rather "less than severe

and more than moderate" (R. 66).  The ALJ then announced he would not let the VE

define these terms (R.66).[3]

Plaintiff takes medication for his ongoing back and knee pain, specifically

Flexeril and Naprosyn (R. 211, 253).  He also takes Cymbalta and Lunesta for anxiety

and insomnia (R. 242).  His overall medical history is sparse.  When he applied for

benefits, the person conducting the telephone interview with the plaintiff noted that

> He seemed rather slow and uneducated.  He didn't have any medical
> information.  He said he was afraid to go to the doctors because of the
> medications they might put him on might kill him.  He said he likes to
> work on computers and can rebuild them .... He had a wreck several
> years ago and even then he wouldn't go to the hospital.  He just seemed
> odd.

R. 116.

A consultative physical examiner concluded that the plaintiff had chronic low

back pain syndrome, bilateral knee pain, and right shoulder pain, but a normal

physical examination (R. 169).  He claims this pain is made worse by movement and

relieved by rest (R. 209).  X-rays were normal (R. 212).

The February 2007 psychological evaluation listed numerous symptoms and

mental problems of the plaintiff (R. 172).  However, it includes numerous reports by

the plaintiff of behavior that the plaintiff testified at hearing were simply untrue,

---

[3]These terms appear on a form regarding the plaintiff's limitations completed by the
plaintiff's treating physician.  The form specifically defines "marked" as "[a]n impairment which
seriously affects ability to function" (R. 205).

incorrect, and not provided by him to Dr. Jon G. Rogers, Ph.D., the examiner. However, Dr. Rogers did concluded the plaintiff suffered from depressive disorder, anxiety disorder, personality disorder, residual effects from breathing asbestos, and psychological stress, and assigned a Global Assessment of Functioning score of 55 (R. 175). He further opined that the plaintiff's ability to understand, remember, and carry out instructions and respond appropriately to supervision, co-workers and work pressures in a work setting would be moderately impaired (R. 176). He further commented that the severity of the plaintiff's impairment was "mild to moderate" (R. 177).

Plaintiff's treating physician completed a residual functional capacity form in July 2007 (R. 205-206). Dr. Jeffery found the plaintiff would have an "extreme" limitation in maintaining social functioning, would have a moderate deficiency in maintaining concentration, persistence, or pace, a marked impairment in responding to customary work pressures, moderate limitations in responding to supervision and coworkers, and other mild limitations (R. 205-206). Dr. Jeffery added that the plaintiff "suffers from severe social phobia with intense panic episodes in social settings. Also poor social skills secondary to schizoid personality traits. Doubt [plaintiff] will be able to maintain employment" (R. 206). The plaintiff's medical records reflect that he experienced panic attacks when leaving home that generally lasted from 30 to 60 minutes, until he could get away or back home (R. 246). He

11

reported leaving his mother's property about one time a month (R. 246).  In August 2008 Dr. Jeffery again found the plaintiff to suffer from social phobia and schizoid personality traits, noting "[t]he patient as ever remains a vested misanthrope.  The patient has isolated himself from others since childhood...." (R. 214).

## Standard of Review

The initial burden of establishing disability is on the claimant, who must prove that due to a mental or physical impairment he is unable to perform his previous work.  If the claimant is successful, the burden shifts to the Commissioner to prove that the claimant can perform some other type of work existing in the national economy.  *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987).

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the  correct legal standards were applied.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971); *Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir.1996); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990).   "Substantial evidence" is defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); *Miles v. Chater*, 84 F.3d 1397 (11th Cir.1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983).

12

This court must also be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen,* 815 F.2d 622, 624 (11th Cir.1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir.1993). However, no such presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 921 F. 2d 1233, 1235 (11th Cir.1991); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir.1991). Furthermore, the Commissioner's "failure to ... provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145-1146.

When making a disability determination, the ALJ must consider the combined effects of all impairments. *Davis v. Shalala*, 985 F.2d at 533; *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir.1990); *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir.1987). When more than one impairment exists, the plaintiff may be found disabled even though none of the impairments considered alone would be disabling. *Id*. The ALJ must evaluate the combination of impairments with respect to the effect they have on the plaintiff's ability to perform the duties of work for which he or she is otherwise capable. *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir.1990). Merely reciting that the plaintiff's impairments in combination are not disabling is not

13

enough.  The ALJ is required to make specific and well articulated findings as to the effect of the combination of impairments.  *Walker*, 826 F.2d at 1001.

### Legal Analysis

In this case, the ALJ found that the plaintiff suffered from the severe impairments of depressive disorder, anxiety disorder, personality disorder with dependent features, generalized social phobia, schizoid personality traits, and visual loss, but did not have any impairment, singly or in combination, that met or medically equaled the criteria of any of the Listing of Impairments found in 20 CFR 404, Subpart P, Appendix 1 (R. 16-17).  The ALJ gave great weight to the opinion of Dr. Rogers, the consultative examiner, because his opinion was consistent with the ALJ's determination of the plaintiff's presentation, response to examination and daily activities (R. 20).  Similarly, the ALJ rejected the opinion of Dr. Jeffery, the plaintiff's treating physician, in the functional assessment, finding it contradicted the Athens-Limestone Counseling Center records, where the plaintiff is a patient of Dr. Jeffery (R. 20).  Based on the ALJ's consideration of the evidence, he determined that the plaintiff could perform low stress, unskilled work (R. 22).  The ALJ disputed the plaintiff's treating physician's opinion regarding the plaintiff's limitations by simply claiming "[s]o there is nothing in these early visits with Dr. Jeffery through July 2007 to indicate "extreme" problems in social functioning, marked impairment of ability to respond to customary work pressures, or even moderate impairment of

14

concentration/persistence/pace (R. 21).   The ALJ further rejected the plaintiff's disability claim because between April 2008 and August 2008, "Dr. Jeffery maintained the claimant without any significant change in treatment..." (R. 21).

The plaintiff argues that the ALJ failed to properly consider the opinion of Dr. Jeffery.  Plaintiff's memorandum, at 9.  The court finds the ALJ, most egregiously, substituted his opinion for that of a medical doctor.  "As the hearing officer, [the ALJ] may not arbitrarily substitute his own hunch or intuition for that of a medical professional."  *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir.1992).

Even more troubling is the ALJ's openly hostile demeanor toward the plaintiff, both during the hearing and in his opinion.  The ALJ seemingly started with the premise that the plaintiff could work, and disregarded all evidence which contradicted his foregone conclusion.  However, Social Security proceedings are meant to be inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits ...." *Sims v. Apfel,* 530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), citing *Richardson v. Perales*, 402 U.S. 389, 400-401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record." *Nyberg v. Comm'r of Soc. Sec.*, 179 Fed. Appx. 589, 590 (11th Cir.2006); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir.1997).

In the Eleventh Circuit, it is not appropriate for the Administrative Law Judge, who is not a medical expert, subjectively to arrive at an index of traits which he expects the claimant to manifest at the hearing, and then to deny the claim when such traits are not observed. *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir.1982). The Eleventh Circuit has termed this "sit and squirm jurisprudence," and forbids that this method of analysis be used. *McRoberts v. Bowen*, 841 F.2d 1077, 1081 (11th Cir.1988); *Johns v. Bowen*, 821 F.2d 551, 557 (11th Cir.1987); *Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir.1984).

The ALJ's hostility was also apparent when he determined that creating new definitions of well established terms was incumbent on him.  During the hearing, the VE testified that marked limitations in responding to work pressures would preclude all employment (R. 62).  The ALJ stated that with "marked" limitations, "that person would still be able to work" (R. 62).  The ALJ noted that the statement of a "marked impairment which seriously affects" but questioned the meaning of the term "seriously affects" (R. 62).  Counsel for plaintiff noted that "marked" was defined in the Social Security regulations, but the ALJ responded that it only means "less than severe" (R. 63-64). The Social Security regulations define "marked" as more than moderate but less than extreme. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.01.  "Severe" on the other hand, has been best defined by the Eleventh Circuit by what it is not. A non-severe impairment is a "'slight abnormality' that has 'such a minimal effect on the individual

16

that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" *Salazar v. Comm'r of Soc. Sec.,* 372 Fed. Appx. 64, 66 (11th Cir.2010) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir.1984)). *See also* 20 C.F.R. § 404.1521(a).

The regulations state:

> Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.

20 CFR 404 Subpart P, App. 1 § 12.00(c).  Thus, the ALJ's contorted definition otherwise was in error and a misstatement of law.  In the present case, the plaintiff was seeking to elicit substantial evidence through the VE's testimony that there were no jobs existing in the national economy that plaintiff could perform based on the limitations contained in Dr. Jeffery's opinion. When the ALJ decided to redefine well accepted terms, he implicitly rejected the opinion of Dr. Jeffery. Moreover, the ALJ's attempts to redefine already defined terms denied the plaintiff the ability to elicit testimony from the VE based on those opinions, thus effectively preventing the plaintiff the ability to obtain substantial evidence that there are no jobs existing in the economy which he could perform. Accordingly, there is a gap in the evidentiary record and the plaintiff has suffered prejudice.

**Conclusion**

Based on the foregoing, the court is of the opinion that the decision of the ALJ was based on errors of law, and therefore the decision of the Commissioner must be **REVERSED** and this case is **REMANDED** for proper consideration of the evidence, proper application of the law, a hearing which comports to the holdings that such hearings are inquisitorial rather than adversarial, and any other action consistent with this opinion.

Because of the ALJ's obvious and open hostility toward this plaintiff, the court highly encourages the matter be remanded to an ALJ who is free from obvious prejudices and biases.

**DONE** and **ORDERED** this 29th day of March, 2011.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE